**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

_____

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | ) )  ) |
| Plaintiff, | ) ) |
| v. | ) ) |
| VLAD B. SPIVAK and SHIRMILA O. DODDI, | ) ) ) |
| Defendants. | ) ) |

Civil Action No.
15-13704-FDS

_____

**MEMORANDUM AND ORDER ON**
**DEFENDANT'S MOTIONS TO DISMISS**

**SAYLOR, J.**

This is a civil-enforcement action brought by the Securities and Exchange Commission

against Vlad Spivak and Shirmila Doddi for insider trading in violation of § 10(b) of the

Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5.

Based on the misappropriation theory of insider trading, the complaint alleges that Doddi, a

financial analyst at a bank, tipped her romantic partner Spivak, a day trader, about a confidential

pending acquisition of one of the bank's clients.  After receiving the nonpublic information from

Doddi, Spivak purchased shares of the target company in both his now-deceased mother's

trading account and his own trading accounts, ultimately realizing profits of $222,357.

In two separate motions—one concerning the trading in his accounts and one concerning

the trading in his mother's account—Spivak has moved to dismiss the complaint under Fed. R.

Civ. P. 9(b) and 12(b)(6).[1]  Among other arguments, Spivak contends that the complaint fails to

---

[1] Doddi has reached a settlement with the SEC and consented to final judgment against her.

allege that Doddi received an objective, pecuniary personal benefit by tipping him.  According to

Spivak, who relies on *United States v. Newman*, 773 F.3d 438 (2d Cir. 2014), absent such

a pecuniary personal benefit to Doddi, she did not breach a fiduciary duty to her employer.

Therefore, absent such a breach by the tipper, Spivak contends that he has no derivative liability

as the tippee.

The law in the First Circuit, based on the Supreme Court's decision in *Dirks v. SEC*, 463

U.S. 646 (1983), is that a tipper receives a sufficient personal benefit if she provides a gift of

nonpublic information to a trading relative or friend with the intent that the tippee trade on that

information.  *See SEC v. Rocklage*, 470 F.3d 1, 7 n.4 (1st Cir. 2006).[2]  That holding may be in

question given the Supreme Court's grant of certiorari in a case involving a similar issue.[3]

Nonetheless, it is currently the controlling law in this circuit.  *See Rocklage*, 470 F.3d at 7 n.4;

*Sargent*, 229 F.3d at 77.

---

[2] *See Dirks*, 463 U.S. at 664 ("The elements of fiduciary duty and exploitation of nonpublic information also exist when an insider makes a gift of confidential information to a trading relative or friend.").  The First Circuit has assumed, without deciding, that a personal benefit to the tipper is required in a case brought under the misappropriation theory.  Assuming that a personal benefit is required in misappropriation cases, the First Circuit has held that a tipper's gift of information to a relative or friend is sufficient.  *See Rocklage*, 470 F.3d at 7 n.4 (noting that "[e]ven [assuming that] there is a requirement that the tipper receive a personal benefit [in a misappropriation theory case], the mere giving of a gift to a relative or friend is a sufficient personal benefit" to the tipper); *SEC v. Sargent*, 229 F.3d 68, 77 (1st Cir. 2000) ("The 'benefit' to the tipper need not be 'specific or tangible.'  A gift to a friend or relative is sufficient." (citation omitted)); *see also United States v. Parigian*, — F.3d ——, 2016 WL 3027702, at *8 (1st Cir. May 26, 2016) (holding that indictment's allegation that tipper and tippee were "reasonably good friends" plus an expectation that the tippee would treat the tipper to a golf outing and luxury entertainment "is enough to allege a benefit if a benefit is required").

[3] *See United States v. Salman*, 792 F.3d 1087, 1094 (9th Cir. 2015) ("Proof that the insider disclosed material nonpublic information with the intent to benefit a trading relative or friend is sufficient to establish the breach of fiduciary duty element of insider trading."), *cert. granted in part*, —— U.S. ——, 136 S. Ct. 899 (2016).  The Supreme Court granted certiorari in *Salman* to address only the first question presented:

> Does the personal benefit to the insider that is necessary to establish insider trading under *Dirks v. SEC*, 463 U.S. 646 (1983), require proof of "an exchange that is objective, consequential, and represents at least a potential gain of a pecuniary or similarly valuable nature," as the Second Circuit held in *United States v. Newman*, 773 F.3d 438 (2d Cir. 2014), *cert. denied*, No. 15-137 (U.S. Oct. 5, 2015), or is it enough that the insider and the tippee shared a close family relationship, as the Ninth Circuit held in this case?

136 S. Ct. 899 (2016).

The complaint alleges that Doddi and Spivak were romantic partners for almost a year and communicated on a near-daily basis.  It also alleges that Doddi initially rejected Spivak's requests for confidential information, even though he told her that "insider trading was not a big deal and that individuals rarely get caught."  Furthermore, it alleges that Doddi relented and gave Spivak material nonpublic information about an upcoming acquisition with the intent that he would purchase shares of the target company.

The Court's decision is a narrow one and follows directly from *Dirks*, *Rocklage*, and *Sargent*:  accepting the allegations as true, the complaint plausibly pleads that Doddi received a personal benefit by tipping Spivak, and thus breached her fiduciary duty to her employer. Accordingly, and for the reasons set forth below, the complaint states a claim upon which relief can be granted, and Spivak's motions will be denied.

## I.   **Background**

Unless otherwise noted, all facts are stated as alleged in the complaint.

### A.   **Factual Background**

Defendants Vlad Spivak and Shirmila Doddi met in early 2011 at a dancing club. (Compl. ¶ 25).  They developed a romantic relationship that lasted through the end of 2011. (*Id.*).  Both defendants lived in the Boston area, where Doddi worked as a financial analyst in the commercial-banking group at Wells Fargo Bank.  (*Id.* ¶¶ 11-12).  Spivak was unemployed, but supported himself, in part, by trading securities.  (*Id.* ¶ 11).  The complaint alleges that Spivak and Doddi communicated on a near "daily basis" throughout 2011 and frequently stayed overnight at each other's homes.  (*Id.* ¶¶ 26-27).

As a financial analyst at Wells Fargo, Doddi often had access to nonpublic information about companies that were clients of the bank.  (*Id.* ¶ 16).  The complaint alleges that Doddi was

aware that she owed a duty to the bank to keep such nonpublic information confidential.  (*Id*. ¶ 17).

Spivak described himself to Doddi as a "day trader," and he frequently spoke with her about the different stocks that he traded.  (*Id*. ¶ 28).  The complaint alleges that Spivak was aware that Doddi had both access to material nonpublic information and a duty not to disclose that information to him.  (*Id*. ¶ 29).  On "multiple occasions" in 2011, Spivak asked her for nonpublic information that she had learned at work.  (*Id*. ¶ 30).  Spivak further told her that insider trading was "not a big deal and that individuals rarely get caught."  (*Id*.).  Until October 2011, Doddi rejected Spivak's requests for nonpublic information and told him that she was not supposed to disclose it.  (*Id*. ¶ 31).

Beginning in May 2011, Wells Fargo assigned Doddi to be the financial analyst for American Dental Partners, Inc. ("ADPI"), a commercial-banking client.  (*Id*. ¶ 19).  In September 2011, Doddi learned that investment bankers from a separate division of Wells Fargo had identified a potential transaction that might interest ADPI.  (*Id*.).  The investment bankers prepared a presentation for ADPI, and Doddi received that presentation by e-mail on September 26, 2011.  (*Id*. ¶ 20).

On October 6, Wells Fargo's relationship manager for ADPI attended a lunch meeting with ADPI's chief financial officer.  (*Id*. ¶ 21).  Among the matters they discussed during the lunch was a possible meeting with the investment bankers to discuss potential "merger and acquisition activity."  (*Id*.).  Doddi did not attend the lunch, but in the course of her employment she learned that one of the subjects discussed was ADPI's possible merger and acquisition activity.  (*Id*. ¶ 22).

On October 13, Doddi received an e-mail from the relationship manager with "HIGHLY

CONFIDENTIAL" in the subject line.  (*Id.* ¶ 23).  The e-mail stated that ADPI's chief financial officer had called him "on a highly confidential basis" to inform him that the private-equity firm JLL Partners, Inc. had agreed to purchase ADPI for $20 per share in a going-private transaction. (*Id.*).  He further told Doddi that ADPI hoped to publicly announce the transaction during the first week of November 2011.  (*Id.*).

Despite refusing to provide Spivak nonpublic information on earlier occasions, Doddi had "several communications" with him concerning ADPI.  (*Id.* ¶¶ 31-32).  Between October 6 and October 9, she told him that she had learned at work that ADPI was "potentially going to be involved in a business-combination transaction."  (*Id.* ¶ 34).  On October 13, less than an hour after receiving the "highly confidential" e-mail detailing JLL's acquisition of ADPI, she sent Spivak a text message "confirming that a transaction involving ADPI was going to take place." (*Id.* ¶ 35).

The complaint alleges that Doddi provided the nonpublic information concerning ADPI's acquisition to Spivak "with the intention that Spivak use the information to purchase ADPI stock."  (*Id.* ¶ 33).  It further alleges that "[a]lthough Doddi did not trade on the information, in tipping Spivak, she conferred a gift upon a romantic partner."  (*Id.* ¶ 36).  According to the complaint, Spivak "knew or should have known" that Doddi obtained the confidential information in the course of her employment at Wells Fargo, and that he also "knew or should have known" that she violated a duty to the bank by disclosing the information to him.  (*Id.* ¶ 34).

Between October 10 and November 1, Spivak purchased 17,100 shares of ADPI stock in three TD Ameritrade accounts that were registered in his name.  (*Id.* ¶ 37).  In addition, between October 12 and 17, Spivak purchased 8,060 shares of ADPI stock in a Fidelity account that was

registered to his mother, Lyudmila Spivak.  (*Id.*).  On November 7, ADPI publicly announced

that it had signed a merger agreement with JLL, whereby JLL would acquire all of ADPI's

outstanding shares for $19 per share.  (*Id.* ¶ 38).

Between November 10, 2011, and February 1, 2012, Spivak sold all 25,160 shares of

ADPI for a total profit of $222,357.  (*Id.* ¶ 39).  Spivak's mother died in April 2014, and the

assets in her Fidelity trading account were transferred to Spivak as the beneficiary on May 7,

2014.  (*Id.* ¶ 40).

### B.    Procedural Background

On November 2, 2015, the SEC filed a complaint against Spivak and Doddi.  The

complaint alleges one count against each defendant for insider trading in violation of § 10(b) of

the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R.

§ 240.10b-5.  On January 20, 2016, the Court entered a consented-to judgment against Doddi.

Spivak has moved to dismiss the claim against him pursuant to Fed. R. Civ. P. 9(b) and 12(b)(6).

## II.    Legal Standard

On a motion to dismiss, the Court "must assume the truth of all well-plead[ed] facts and

give . . . plaintiff the benefit of all reasonable inferences therefrom."  *Ruiz v. Bally Total Fitness*

*Holding Corp.*, 496 F.3d 1, 5 (1st Cir. 2007) (citing *Rogan v. Menino*, 175 F.3d 75, 77 (1st Cir.

1999)).  To survive a motion to dismiss, the complaint must state a claim that is plausible on its

face. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  That is, "[f]actual allegations must

be enough to raise a right to relief above the speculative level, . . . on the assumption that all the

allegations in the complaint are true (even if doubtful in fact)."  *Id.* at 555 (citations omitted).

"The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a

sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678

(2009) (quoting *Twombly*, 550 U.S. at 556).  Dismissal is appropriate if the complaint fails to set

forth "factual allegations, either direct or inferential, respecting each material element necessary

to sustain recovery under some actionable legal theory."  *Gagliardi v. Sullivan*, 513 F.3d 301,

305 (1st Cir. 2008) (quoting *Centro Medico del Turabo, Inc. v. Feliciano de Melecio*, 406 F.3d 1,

6 (1st Cir. 2005)).

A complaint alleging fraud must also "state with particularity the circumstances

constituting fraud" in order to survive a motion to dismiss under Fed. R. Civ. P. 9(b).  Because

insider-trading cases involve securities-fraud claims brought under Rule 10b-5, generally the

SEC must satisfy Rule 9(b) in such cases.  However, some courts have held that the requirements

of Rule 9(b) may be relaxed in insider-trading cases where facts about the alleged fraud are

"peculiarly within the [defendants'] knowledge."  *See, e.g.*, *SEC v. Payton*, 97 F. Supp. 3d 558,

563 n.3 (S.D.N.Y. 2015).[4]  Nonetheless, the Court need not decide the applicability of Rule 9(b)

here because, as explained below, the complaint alleges specific facts about the "who, what,

when, where, and how of the alleged fraud" that are sufficient to state a claim even under the

more onerous Rule 9(b) standard.  *See United States ex rel. Ge v. Takeda Pharm. Co.*, 737 F.3d

116, 123 (1st Cir. 2013) (internal quotation marks omitted).

## III.  **Analysis**

The complaint alleges that Doddi and Spivak violated Rule 10b-5 under the

misappropriation theory of insider trading.  Pursuant to Fed. R. Civ. P. 9(b) and 12(b)(6), Spivak

has filed two motions to dismiss, one concerning the trading in his accounts and one concerning

the trading in his mother's account.  Spivak contends that the complaint should be dismissed

---

[4] *See also SEC v. One or More Unknown Traders in the Secs. of Onyx Pharms., Inc.*, 2014 WL 5026153, at
*4 (S.D.N.Y. Sept. 29, 2014) ("Rule 9(b) is therefore relaxed only to the following extent:  if a tip took place under
circumstances known only to the defendant and the tipper, the plaintiff may plead a belief about the content and the
circumstances of the tip, coupled with particular facts supporting that belief.").

because it fails to allege (1) that Doddi breached a fiduciary duty by receiving a personal benefit for tipping Spivak; (2) that Spivak was aware of Doddi's breach; and (3) that Spivak acted with the requisite scienter.  He also contends that the complaint fails to allege facts necessary to give the Court jurisdiction over the assets of his mother.

### A.      __Insider Trading Background__

The law concerning insider trading derives predominantly from the text of § 10(b) and Rule 10b-5.  As the First Circuit has explained,

> [t]he text of § 10(b) makes it unlawful to "use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of" rules promulgated by the SEC.  15 U.S.C. § 78j(b).  Rule 10b-5 furnishes further explication of this statute, providing inter alia that it is unlawful to "engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security."  17 C.F.R. § 240.10b-5(c).

*Rocklage*, 470 F.3d at 6.  "From these two sources of law on insider trading, the Supreme Court has fashioned two theories of liability:  the 'classical' theory, and the 'misappropriation' theory."  *Id.* (citing *United States v. O'Hagan*, 521 U.S. 642, 651-52 (1997)).

> Under the classical theory of insider trading, § 10(b) and Rule 10b-5 are violated when
>
> an insider trades (without disclosure) in a corporation's securities based on material[] nonpublic information that he has acquired.  So long as that insider owes a fiduciary duty to the corporation's stockholders, the Supreme Court has deemed such trades to be deceptive because they constitute a breach of that fiduciary duty.  However, when the trading individual owes no fiduciary duty to the stockholders of the traded-in corporation, and he has not obtained the information from one who has breached such a duty, there can be no insider trading liability under the classical theory.

*Id.* (citing *O'Hagan*, 521 U.S. at 651-52; *Chiarella v. United States*, 445 U.S. 222, 231-35 (1980)).

Liability under the misappropriation theory "is based on deception of the source of the information, rather than on deception of the shareholders; it is that deception which brings this

trading within the statutory language." *Id.*  In other words, under the misappropriation theory, "[l]iability may attach where an 'outsider' possesses material nonpublic information about a corporation and another person uses that information to trade in breach of a duty owed to the owner." *Newman*, 773 F.3d at 445-46; *see O'Hagan*, 521 U.S. at 652 ("[T]he misappropriation theory premises liability on a fiduciary-turned-trader's deception of those [outsiders] who entrusted him with access to confidential information.").  In this case, the SEC is proceeding under the misappropriation theory, where Wells Fargo is the alleged outsider that possessed nonpublic information about ADPI, and Doddi is the alleged misappropriator who deceived Wells Fargo by tipping Spivak about the information she was entrusted with.

Along with insiders and misappropriators, tippees can also be held liable for insider trading under both theories.  As the Second Circuit explained in *Newman*,

> [c]ourts have expanded insider trading liability to reach situations where the insider or misappropriator in possession of material nonpublic information (the "tipper") does not himself trade but discloses the information to an outsider (a "tippee") who then trades on the basis of the information before it is publicly disclosed.  *The elements of tipping liability are the same regardless of whether the tipper's duty arises under the "classical" or the "misappropriation" theory.*

773 F.3d at 446 (emphasis added) (citations omitted); *see also Salman*, 792 F.3d at 1092 n.4 (noting that the elements of tippee liability are the same under both theories).

To state a civil claim for insider trading against a tippee under the misappropriation theory, the SEC must plead particularized facts that plausibly show:

(1) the misappropriating tipper was entrusted with a fiduciary duty by the owner of the information;

(2) the tipper breached that duty by

(a) disclosing confidential information to a tippee

(b) in exchange for a "personal benefit";

(3) the tippee knew or should have known of the tipper's breach (that is, he knew or

should have known that the information was confidential and divulged by the tipper

for a "personal benefit"); and

(4) the tippee acted with scienter (which, in the context of a civil case, means that he

intentionally or recklessly traded on the basis of that material nonpublic information

or tipped another for a personal benefit).

*See Parigian*, 2016 WL 3027702, at *3 ("In a civil case, the government need only show that the

'tippee knows or should know that there has been a breach [of the tipper's fiduciary duty].'"

(quoting *Dirks*, 463 U.S. at 660); *SEC v. Obus*, 693 F.3d 276, 288 (2d Cir. 2012) ("Thus, [civil]

tippee liability can be established if a tippee knew or had reason to know that confidential

information was initially obtained and transmitted improperly (and thus through deception), and

if the tippee intentionally or recklessly traded while in knowing possession of that

information."); *SEC v. Jafar*, 2015 WL 3604228, at *4 (S.D.N.Y. June 8, 2015) (citing *Newman*,

773 U.S. at 450).[5]

Because the alleged "personal benefit" to Doddi, or lack thereof, is the core of Spivak's

argument, fuller explanation of that element is warranted.

**B.     Personal Benefit**

The personal benefit requirement for tippee liability derives from the Supreme Court's

opinion in *Dirks*. *Salman*, 792 F.3d at 1091.  In *Dirks*, the court held that in order to determine

whether an insider is liable for insider trading by tipping another, "the test is whether the insider

---

[5] Without deciding the issue, the First Circuit has assumed on three occasions that a personal benefit must be proved in cases brought under the misappropriation theory—as it must in cases brought under the classical theory.  *See Parigian*, 2016 WL 3027702, at *7; *Rocklage*, 470 F.3d at 7 n.4; *Sargent*, 229 F.3d at 77.  Furthermore, as noted above, the Second and Ninth Circuits have both concluded that the elements of tippee liability are identical under the two theories.  For those reasons, and because the SEC has conceded the issue in its brief, the Court will assume that the SEC must plead that Doddi received a personal benefit.

personally will benefit, directly or indirectly, from his disclosure." 463 U.S. at 662. The court

made clear that "[a]bsent some personal gain [to the insider], there has been no breach of duty to

stockholders." *Id.* The court further noted that a tippee is equally liable if "the tippee knows or

should know that there has been [such] a breach," *id.* at 660, that is, knows or should know that

the insider disclosed confidential information in exchange for a personal benefit. But "[a]bsent

some breach by the insider," and a tippee's knowledge of that breach, "there is no derivative

breach" for a tippee. *Id.* at 662.

Of particular importance in this case, the *Dirks* court then went on to define what

constitutes a "personal benefit":

> [T]he initial inquiry is whether there has been a breach of duty by the insider.
> This requires courts to focus on objective criteria, *i.e.,* whether the insider
> receives a direct or indirect personal benefit from the disclosure such as a
> pecuniary gain or a reputational benefit that will translate into future
> earnings. . . . There are objective facts and circumstances that often justify such
> an inference. For example, there may be a relationship between the insider and
> the recipient that suggests a *quid pro quo* from the latter, or an intention to benefit
> the particular recipient. The elements of fiduciary duty and exploitation of
> nonpublic information also exist when an insider makes a gift of confidential
> information to a trading relative or friend. The tip and trade resemble trading by
> the insider himself followed by a gift of the profits to the recipient.

*Id.* at 663-64 (citations omitted).

Relying on *Dirks*, the First Circuit has stated in one misappropriation case that "[t]he

'benefit' to the tipper need not be 'specific or tangible.' A gift to a friend or relative is

sufficient." *Sargent*, 229 F.3d at 77 (citation omitted). In *Sargent*, the First Circuit held that the

SEC presented sufficient evidence at trial from which a jury could reasonably conclude that the

misappropriating tipper benefited from his tip to the tippee. It reached that conclusion because

> [a]t trial, [the tipper] testified that he and [the tippee] were "friendly." [The
> tipper] had referred over 75 people to [the tippee] for their dental work. Further,
> [the tipper] stated that he often went to [the tippee] for help in connection with
> [the tipper's] service to the local chamber of commerce. [The tipper's] sister-in-

> law owed [the tippee] money and another of [the tipper's] relatives was
> threatening to harm [the tippee's] business.  From this evidence, a jury could infer
> that [the tipper] tipped [the tippee] about Purolator in an effort to effect a
> reconciliation with his friend and to maintain a useful networking contact.

229 F.3d at 77.  In another misappropriation case, the First Circuit stated that "[e]ven if there is a

requirement that the tipper receive a personal benefit [in a misappropriation case], the mere

giving of a gift to a relative or friend is a sufficient personal benefit."  *Rocklage*, 470 F.3d at 7

n.4 (citing *Sargent*, 229 F.3d at 77).  In *Rocklage*, the court held that "the gift of information

[that the defendant misappropriator] gave her brother [the tippee] me[t] that standard."  *Id.*

Until *Newman*, other circuits, including the Second Circuit, relied on *Dirks* in fashioning

similar personal-benefit standards.  For example, only a year before its decision in *Newman*, the

Second Circuit stated in *United States v. Jiau* that

> "[p]ersonal benefit" is "broadly defined . . . [to] include[] not only 'pecuniary
> gain,'" *Obus*, 693 F.3d at 285 (quoting *Dirks*, 463 U.S. at 663), but also, *inter
> alia*, any "reputational benefit that will translate into future earnings," *Dirks*, 463
> U.S. at 663, and "the benefit one would obtain from simply 'mak[ing] a gift of
> confidential information to a trading relative or friend.'"  *Obus*, 693 F.3d at 285
> (quoting *Dirks*, 463 U.S. at 664).  The existence of "a relationship between the
> insider and the recipient that suggests a *quid pro quo* from the latter, or an
> intention to benefit the [latter]" may be sufficient to justify an inference of
> personal benefit.  *Dirks*, 463 U.S. at 664.

734 F.3d 147, 153 (2d Cir. 2013) (alterations in original).  Applying that standard, the court

concluded that

> [t]he proof required to show personal benefit to the tipper is modest and is
> satisfied with respect to both [tippers involved].  *See Obus*, 693 F.3d at 292 ("In
> light of the broad definition of personal benefit set forth in *Dirks*, this
> [evidentiary] bar is not a high one.").

*Id.*

However, a year later in *Newman*, the Second Circuit articulated what appears to be a

more stringent standard for a personal benefit—albeit in a case with weaker evidence and a more

12

attenuated theory of liability.  The defendants in *Newman* were Todd Newman, a portfolio

manager at the hedge fund Diamondback Capital, and Anthony Chiasson, a portfolio manager at

the hedge fund Level Global.  773 F.3d at 442-43.  They were indicted under the classical theory

for trading on material nonpublic information about two companies, Dell and NVIDIA.  *Id.*  The

information came to them by two distinct tipping chains, one for Dell and one for NVIDIA.  *Id.*

The Dell chain originated with Rob Ray, a member of Dell's investor relations department, who

tipped information about Dell's earnings to Sandy Goyal, an analyst at another firm.  *Id.* at 443.

Goyal relayed the information to Diamondback analyst Jesse Tortora, who relayed it to his boss,

portfolio manager Newman, as well as to other analysts including Level Global analyst Sam

Adondakis, who passed the information to his boss, Chiasson.  *Id.*  Accordingly, in the Dell

chain, "Newman and Chiasson [were] three and four levels removed from the insider tipper,

respectively."  *Id.*  The NVIDIA chain began with Chris Choi, an insider at the company, who

tipped information to Hyung Lim, whom "Choi knew from church."  *Id.*  Lim passed the

information to Danny Kuo, an analyst at another company, who circulated the information to a

group of analyst friends, which included Tortora and Adondakis, who relayed the information to

their bosses Newman and Chiasson.  *Id.*  Accordingly, in the NVIDIA chain, "Newman and

Chiasson [were] four levels removed from the insider tippers."  *Id.*

　　　At trial, the government presented the following evidence concerning personal benefits to

the Dell and NVIDIA insiders from their first-level tippees.  The Dell tipper and tippee, Ray and

Goyal, attended business school together and had been colleagues at Dell, but were not "close."

*Id.* at 452.  The tippee Goyal provided career advice and assistance to Ray, for example, editing

his resume.  *Id.*  However, Goyal's advice began before Ray started to give him inside

information, and Goyal testified that he would have given it as a routine professional courtesy

without receiving anything in return. *Id.* As to the NVIDIA chain, the insider Choi and his

tippee Lim, were "family friends" who met through church and occasionally socialized with one

another. *Id.* The tippee Lim testified that he did not provide anything of value to Choi, and that

Choi did not even know that he was trading in NVIDIA stock. *Id.*

The Second Circuit vacated both defendants' convictions and remanded to the district

court with instructions to dismiss the indictment with prejudice. It held that "[t]he circumstantial

evidence . . . was simply too thin to warrant the inference that the corporate insiders received any

personal benefit in exchange for their tips." *Id.* at 451-52. In describing the "personal benefit"

standard, the court noted that while it is "permissive" under *Dirks*, it "does not suggest that the

government may prove the receipt of a personal benefit by the mere fact of a friendship,

particularly of a casual or social nature." *Id.* at 452. The court further stated:

> To the extent *Dirks* suggests that a personal benefit may be inferred from a
> personal relationship between the tipper and tippee, where the tippee's trades
> "resemble trading by the insider himself followed by a gift of the profits to the
> recipient," *see* 463 U.S. at 664, we hold that such an inference is impermissible in
> the absence of proof of a meaningfully close personal relationship that generates
> an exchange that is objective, consequential, and represents at least a potential
> gain of a pecuniary or similarly valuable nature. In other words, as Judge Walker
> noted in *Jiau*, this requires evidence of "a relationship between the insider and the
> recipient that suggests a *quid pro quo* from the latter, or an intention to benefit the
> [latter]." *Jiau*, 734 F.3d at 153.

*Id.* In addition to holding that the evidence concerning personal benefits to the insiders was

insufficient, the court also concluded that "the government presented absolutely no testimony or

any other evidence that Newman and Chiasson knew they were trading on information obtained

from insiders, or that [they knew] those insiders received any benefit in exchange for such

disclosures." *Id.* at 453.

Since *Newman*, courts have rejected arguments by defendants who read the Second

Circuit's decision to hold that "evidence of a friendship or familial relationship between tipper

and tippee, standing alone, is insufficient to demonstrate that the tipper received a benefit." *See, e.g.*, *Salman*, 792 F.3d at 1093; *see also SEC v. Andrade*, —— F. Supp. 3d ——, 2016 WL 199423, at *3 (D.R.I. Jan. 15, 2016) ("The Ninth Circuit's recent decision in *Salman* . . . cautions against taking *Newman* too far out of its context."). In *Salman*, the Ninth Circuit considered a misappropriation-theory case, where the defendant had been convicted of insider trading based on a series of tips he received from his brother-in-law, Michael Kara, who in turn had received the nonpublic information from his investment-banker brother, Maher Kara. 792 F.3d at 1088-90. At trial, the investment banker Maher testified that "he disclosed the material nonpublic information for the purpose of benefitting and providing for his brother Michael," *id.* at 1094, and "the government presented evidence that Salman knew full well that Maher Kara was the source of the information." *Id.* at 1089.

Judge Rakoff, sitting by designation from the Southern District of New York, rejected Salman's contention that the absence of "any such tangible benefit [to the tipper Maher] in exchange for the inside information" invalidated his conviction. *Id.* at 1093. Instead, the court held:

> To the extent *Newman* can be read to go so far, we decline to follow it. Doing so would require us to depart from the clear holding of *Dirks* that the element of breach of fiduciary duty is met where an "insider makes a gift of confidential information to a trading relative or friend." *Dirks*, 463 U.S. at 664. Indeed, *Newman* itself recognized that the "'personal benefit is broadly defined to include not only pecuniary gain, but also, *inter alia*, . . . the benefit one would obtain from simply making a gift of confidential information to a trading relative or friend.'" *Newman*, 773 F.3d at 452 (alteration omitted) (quoting *United States v. Jiau*, 734 F.3d 147, 153 (2d Cir. 2013)).

> . . . .

> If Salman's theory were accepted and this evidence found to be insufficient, then a corporate insider or other person in possession of confidential and proprietary information would be free to disclose that information to her relatives, and they would be free to trade on it, provided only that she asked for no tangible

> compensation in return.  Proof that the insider disclosed material nonpublic
> information with the intent to benefit a trading relative or friend is sufficient to
> establish the breach of fiduciary duty element of insider trading.

*Id.* at 1093-94.  Subsequently, the Supreme Court granted certiorari in *Salman* to resolve the

following issue:

> Does the personal benefit to the insider that is necessary to establish insider
> trading under *Dirks v. SEC*, 463 U.S. 646 (1983), require proof of "an exchange
> that is objective, consequential, and represents at least a potential gain of a
> pecuniary or similarly valuable nature," as the Second Circuit held in *United
> States v. Newman*, 773 F.3d 438 (2d Cir. 2014), *cert. denied*, No. 15-137 (U.S.
> Oct. 5, 2015), or is it enough that the insider and the tippee shared a close family
> relationship, as the Ninth Circuit held in this case?

—— U.S. ——, 136 S. Ct. 899 (2016).

Finally, in *United States v. Parigian*, the First Circuit considered a defendant's appeal

seeking to dismiss an indictment that charged him with insider trading under the

misappropriation theory.  2016 WL 3027702, at *1.[6]  Parigian, relying on *Newman*, challenged

the indictment for lack of evidence concerning a personal benefit to his tipper, golfing "buddy"

Eric McPhail, who misappropriated evidence from an insider at a company.  *Id.* at *7.  The court

cited *Dirks*, *Sargent*, and *Rocklage* for the proposition that "[t]he elements of fiduciary duty and

exploitation of nonpublic information also exist when an insider makes a gift of confidential

information to a trading relative or friend."  *Id.* (quoting *Dirks*, 463 U.S. at 664).  Rejecting

Parigian's challenge, the court concluded as follows:

> Here, the indictment paints McPhail and Parigian as reasonably good friends.
> Moreover, the indictment alleges that McPhail requested—and was promised—
> various tangible luxury items in return for the tips.  This would appear to be
> enough under our precedent.
>
> We do recognize that the Second Circuit itself has recently adopted a more
> discriminating definition of the benefit to a tipper in a classical insider trading
> case, rejecting as insufficient the mere existence of a personal relationship "in the

---

[6] Parigian pleaded guilty but reserved the right to challenge the indictment on appeal for lack of evidence
concerning a personal benefit.

absence of proof of a meaningfully close personal relationship that generates an exchange that is objective, consequential, and represents at least a potential gain of a pecuniary or similarly valuable nature." *Newman*, 773 F.3d at 452. Subsequently, the Ninth Circuit seemed to align itself more closely with our holding in *Rocklage*, and the Supreme Court thereafter granted certiorari to review the issue. *See United States v. Salman*, 792 F.3d 1087, 1094 (9th Cir. 2015) ("Proof that the insider disclosed material nonpublic information with the intent to benefit a trading relative or friend is sufficient to establish the breach of fiduciary duty element of insider trading."), *cert. granted in part*, —— U.S. ——, 136 S. Ct. 899 (2016).

How this will all play out, we do not venture to say because, as a three-judge panel, we are bound to follow this circuit's currently controlling precedent. We therefore hold that the indictment's allegations of a friendship between McPhail and Parigian plus an expectation that the tippees would treat McPhail to a golf outing and assorted luxury entertainment is enough to allege a benefit if a benefit is required.

*Id.* at *7-8.

### C.    The Application of the Rule in the Present Case

Spivak contends that the complaint should be dismissed because it fails to allege (1) that Doddi received a personal benefit for tipping Spivak; (2) that Spivak was aware of Doddi's breach; and (3) that Spivak acted with the requisite scienter. He also contends that the complaint fails to allege facts necessary to give the Court jurisdiction over the assets of his mother.

### 1.    Doddi's Personal Benefit

Spivak's first argument—that his romantic partner Doddi did not receive a personal benefit by gifting him the information about the upcoming acquisition—is squarely contradicted by *Dirks* and the controlling law of this circuit. In *Dirks*, the Supreme Court explained how courts should determine whether a personal benefit exists:

There are objective facts and circumstances that often justify such an inference. For example, there may be a *relationship between the insider and the recipient* that suggests a *quid pro quo* from the latter, *or an intention to benefit the particular recipient.* The elements of fiduciary duty and exploitation of nonpublic information *also exist when an insider makes a gift of confidential information to*

> *a trading relative or friend.*  The tip and trade resemble trading by the insider himself followed by a gift of the profits to the recipient.

463 U.S. at 664 (emphasis added).  Here, the complaint alleges that Doddi, who communicated on almost a daily basis during her nearly year-long romantic relationship with Spivak, "knowingly provided Spivak with material, nonpublic information about the possibility of merger and acquisition activity involving ADPI . . . with the *intention that Spivak use the information to purchase ADPI stock*."  (Compl. ¶ 33) (emphasis added).  That allegation satisfies the requirements of *Dirks*.

Moreover, the First Circuit has cited *Dirks* in holding that a misappropriator who provides a gift of confidential information to a trading relative or friend receives a sufficient personal benefit to trigger liability for insider trading.  *See Rocklage*, 470 F.3d at 7 n.4 ("[T]he mere giving of a gift to a relative or friend is a sufficient personal benefit."); *Sargent*, 229 F.3d at 77 ("The 'benefit' to the tipper need not be 'specific or tangible.'  A gift to a friend or relative is sufficient." (citation omitted)).  The complaint satisfies that standard by alleging that "[a]lthough Doddi did not trade on the information, in tipping Spivak, she conferred *a gift upon a romantic partner*."  (Compl. ¶ 36) (emphasis added).

*Dirks*, *Rocklage*, and *Sargent* remain the controlling law concerning the definition of a personal benefit in this circuit, and the complaint's allegations quite clearly satisfy that definition.  Spivak, however, urges the Court to apply the personal-benefit standard employed by the Second Circuit in *Newman*, and contends that the complaint fails to demonstrate that Doddi received a pecuniary personal benefit.  Of course, *Dirks*, *Rocklage*, and *Sargent* control this case, not *Newman*'s "more discriminating definition of the benefit to a tipper."  *See Parigian*, 2016 WL 3027702, at *8.  Thus, the inquiry could end there.  However, "the Court acknowledges the particular expertise of the Second Circuit in this area," *Andrade*, 2016 WL 199423, at *3, and

therefore Spivak's argument warrants further explanation.  *See Salman*, 792 F.3d at 1092 ("[W]e would not lightly ignore the most recent ruling of our sister circuit [*Newman*] in an area of law that it has frequently encountered.").  Nevertheless, Spivak's reliance on *Newman* is misplaced for at least two reasons.

First, this case poses considerable procedural and factual differences from *Newman*. Whereas this case is a civil matter involving a motion to dismiss, *Newman* involved an appeal from a criminal conviction.  Here, the complaint need only plead facts—which the Court must accept as true—that demonstrate a plausible personal benefit to Doddi.  Furthermore, it strains logic to compare the facts of *Newman* to this case.  In *Newman*, which involved tippees who were three and four levels removed from the insiders, the relationships between the insiders and primary tippees were not meaningfully close.  For example, in the NVIDIA tipping chain, the insider and tippee were "casual acquaintances," and the tippee testified that the insider "did not know that [the tippee] was trading NVIDIA stock . . . thus undermining any inference that [the insider] intended to make a 'gift' of the profits earned on any transaction based on confidential information."  *Newman*, 773 F.3d at 453.  In contrast, Doddi and Spivak were in a romantic relationship for nearly a year and communicated on almost a daily basis.  Doddi knew Spivak was a day trader, and the two frequently spoke about the stocks he traded.  Furthermore, Doddi initially refused Spivak's requests for nonpublic information, even though he told her that insider trading was "not a big deal" because individuals "rarely get caught."  The complaint, however, alleges that Doddi ultimately relented and intended to benefit Spivak by tipping him about the ADPI acquisition in a text message less than an hour after receiving the "highly confidential" e-mail finalizing the transaction.  Those allegations are considerably different from the facts of

*Newman*, and are sufficiently plausible to state a claim that Doddi received a benefit by gifting confidential information to a trading romantic partner.

Second, Spivak's interpretation of *Newman* takes the Second Circuit's holding out of context. *Newman* does not stand for the proposition that Spivak advances—that even a close romantic relationship between tipper and tippee is insufficient to demonstrate that the tipper received a benefit, absent "at least a potential gain of a pecuniary" benefit or "similarly valuable nature" to the tipper. *See Newman*, 773 F.3d at 452. Actually, the Second Circuit held that

> [t]o the extent that *Dirks* suggests that a personal benefit may be inferred from a personal relationship between the tipper and tippee, where the tippee's trades resemble trading by the insider himself followed by a gift of the profits to the recipient, we hold that such an inference is impermissible in the absence of proof of a *meaningfully close personal relationship* that generates an exchange that is objective, consequential, and represents at least a potential gain of a pecuniary *or similarly valuable nature*. In other words . . . this requires evidence of a relationship between the insider and the recipient that suggests a *quid pro quo* from the latter, *or an intention to benefit the latter*.

*Id.* (emphasis added) (citations, alterations, and internal quotation marks omitted). In other words, even under *Newman*'s more discriminating personal-benefit definition, evidence of a "meaningfully close personal relationship" that suggests the tipper's "intent to benefit" the tippee is sufficient.

In rejecting a defendant's interpretation of *Newman* that is similar to Spivak's, a court in this circuit explained as follows:

> Yet [*Newman*] does not foreclose the possibility that in some cases—particularly close familial relationships—the fact that the tip was given and traded on is, on its own, enough for an inference of the intention to benefit. . . .
>
> For example, in *Salman*, there was a "close fraternal relationship," 792 F.3d at 1090; likewise, in *Rocklage*, the First Circuit found that "[t]he gift of information Mrs. Rocklage gave *her brother*" met the benefit standard. 470 F.3d at 7 n.4 (emphasis added). By contrast, if the relationship is merely "of a casual or social nature," [as in *Newman*], then the government must put forth evidence of "a meaningfully close personal relationship that generates an exchange that is

> objective, consequential, and represents at least a potential gain of a pecuniary or similarly valuable nature." *Newman*, 773 F.3d at 452. **This makes sense: people are unlikely to take the risk of disclosing confidential information to a mere casual acquaintance unless there is something in it for them; however, they might take that risk for a close friend or family member solely with the intention to benefit that person.**

*Andrade*, 2016 WL 199423, at *4 (emphasis added).  As the Ninth Circuit recognized in *Salman*, if Spivak's interpretation of *Newman* was correct and the complaint was found to be insufficient, "then a corporate insider or other person in possession of confidential and proprietary information would be free to disclose that information to her relatives [or romantic partner], and they would be free to trade on it, provided only that she asked for no tangible compensation in return."  *See* 792 F.3d at 1094.

The complaint alleges that Doddi and Spivak had a meaningfully close, nearly year-long romantic relationship, and that she made a gift of nonpublic information directly to him with the intent that he would benefit by purchasing shares of the target company.  Even under *Newman*, those allegations state a claim for insider trading.

Accordingly, the complaint plausibly pleads that Doddi received a personal benefit by disclosing nonpublic information to Spivak, and thus breached a duty to her employer.

### 2.    Spivak's Knowledge of Doddi's Breach

It is well-established that a tippee cannot be held civilly liable for insider trading unless "the tippee knows or should know that there has been a breach" of the tipper's fiduciary duty. *Dirks*, 463 U.S. at 660.  Spivak contends that the complaint fails to allege that he should have known that Doddi received a personal benefit by disclosing information that was confidential.

Spivak's argument is unpersuasive, because the complaint alleges that he was *directly* tipped by Doddi, his romantic partner.  *See Newman*, 773 F.3d at 448 (noting that its earlier insider-trading cases involved stronger proof because they "involved tippees who *directly*

participated in the tipper's breach (and therefore *had knowledge* of the tipper's disclosure for personal benefit) or tippees who were explicitly apprised of the tipper's gain by an intermediary tippee" (emphasis added)).  Moreover, the complaint alleges that Spivak knew that Doddi was a financial analyst at Wells Fargo and that she had access to material nonpublic information about the bank's clients.  Indeed, it alleges that he asked her for such information on a number of occasions, but that she told him that she was not permitted to disclose confidential information.  The complaint alleges that Spivak responded by acknowledging that trading on Doddi's confidential information would constitute insider trading, but told her that people infrequently were caught.  And of course, Spivak was aware of his own romantic relationship with Doddi.  Thus, the complaint sufficiently alleges facts that, if true, would demonstrate Spivak's awareness that Doddi received a personal benefit by disclosing confidential information to him.

### 3.    <u>Scienter</u>

The complaint also sufficiently pleads that Spivak intended to manipulate or deceive by intentionally or recklessly purchasing shares of ADPI while in possession of material nonpublic information.  Again, the complaint alleges that Spivak asked Doddi for confidential information about the bank's clients on several occasions, attempting to persuade her that insider trading was not a "big deal."  When Doddi ultimately relented and began to apprise him of the potential ADPI transaction on October 6, 2011, Spivak began to purchase ADPI shares.  He continued to purchase shares after she told him that JLL and ADPI had reached an agreement in principle on October 13, eventually purchasing 25,160 shares of ADPI in total.  Accordingly, the complaint adequately pleads facts that demonstrate Spivak recklessly or intentionally purchased shares of

ADPI while in possession of material nonpublic information.

4.   **Assets of Spivak's Mother**

Finally, Spivak contends that the SEC has failed to "establish appropriate jurisdiction over Lyudmila Spivak, her trading activity, and her estate in order to include trading in her account under the complaint filed." (Def. Second Mem. 10).  However, the complaint alleges that Spivak, not his mother, purchased 8,060 shares of ADPI stock in his mother's Fidelity trading account.  Moreover, his mother has since passed away, and Spivak became the owner of her account's proceeds.  Accordingly, if those trades are ultimately proved to be improper under Rule 10b-5, Spivak is liable, not his mother.  While Spivak contends that his mother directed the purchases of ADPI in her account, that is essentially a denial of wrongdoing that amounts to a factual dispute, which is not properly resolved on a motion to dismiss.

IV.   **Conclusion**

For the foregoing reasons, defendant's motions to dismiss are DENIED.

**So Ordered.**

/s/ F. Dennis Saylor
F. Dennis Saylor IV
Dated:  July 12, 2016                    United States District Judge